## Bertha E. Farrand v. Abram J. Aldrich and George W. Stearns.

*Libel and slander—Evidence—Financial standing of defendant—Damages—Trial—Error without prejudice.*

| | |
|---|---|
| 85 | 593 |
| 97 | 138 |
| 85 | 593 |
| 101 | 290 |
| 85 | 593 |
| 110 | 142 |
| 85 | 593 |
| 112 | 214 |
| 85 | 593 |
| 125 | 116 |

1. Where the name of the plaintiff in a libel suit is misspelled in the alleged libelous article, but in sound is very similar to the correct name, it is competent for the plaintiff to show by persons living in the vicinity, and who read the article, that they understood it to refer to the plaintiff.

2. The admissions of a newspaper publisher, made six months after the publication of a libelous article, as to the *present* circulation of his paper, are competent evidence, as tending to show the extent of such circulation when the article was published.

3. It is not competent to enter into the details of the finances of a defendant in a libel or slander suit. The inquiry should be directed to his reputed financial standing in the community.

    So *held*, where the plaintiff was allowed to introduce the assessment rolls of the township and wards in which the defendants were assessed, for the purpose of showing their standing.

4. The publication of an article, without investigation, charging a young woman, against whose character the record fails to cast even a suspicion, with the grossest immorality, when a brief investigation would have reached the truth, is unwarranted, and a verdict for $1,000 damages in such a case will not be set aside because of the erroneous admission in evidence of an assessment roll, upon which the defendants were assessed, for the purpose of showing their financial standing.

5. Testimony was received of the conduct, exclamations, and acts of the plaintiff in a libel suit when she first read the libelous article. No testimony was offered as to what she said afterwards, but her uncle and aunt, with whom she lived the most of the time for about two months after such publication, testified to her appearance and conduct during that time, and that they often heard her cry and sob in the night; which testimony is held competent, the judge having very carefully instructed the jury in regard to its consideration and effect.

6. An assignment of error, based on alleged improper statements

85 Mich—38.

by the counsel for the appellee in his argument to the jury, .will not be considered where the objectional language is not set forth in the record.

7. Requests to charge based upon declarations of the plaintiff of which no evidence was given on the trial are properly refused.

8. Where there is no fact in issue to which it is material or necessary to call the plaintiff as a witness, no unfavorable presumption can arise from his failure to testify.

9. The fact that the jury acquit the defendant of malice, and therefore of willfulness, in the publication of an article charging a virtuous young woman with the grossest immorality, will not prevent her from recovering for injury to her feelings, character, and reputation, for humiliation, shame, and disgrace which the publication brought upon her, and for illness of body and worry of mind; and the jury may also consider the effect that such a publication will have upon her in the future.

Error to Branch. (Lane, J., presiding.) Argued April 15 and 16, 1891. Decided May 8, 1891.

Case. Defendants bring error. Affirmed. The facts are stated in the opinion.

*Champion & Champion (John B. Shipman,* of counsel), for appellants, contended:

1. Plaintiff could not prove by witnesses that from reading the article they believed the person intended in it was the plaintiff; citing *Van Vechten v. Hopkins,* 5 Johns. 217, 225; *Gibson v. Williams,* 4 Wend. 320; *Beardsley v. Maynard,* Id. 337, 359; *Wright v. Paige,* 36 Barb. 438; *Snell v. Snow,* 13 Metc. 278; *Rangler v. Hummel,* 37 Penn. St. 130; *McCue v. Ferguson,* 73 Id. 333; *Briggs v. Byrd,* 11 Ired. 353; *Gribble v. Press Co.,* 37 Minn. 277; *White v. Sayward,* 33 Me. 326; *Cresinger v. Reed,* 25 Mich. 450.

2. The defendants' wealth is immaterial; citing *Rosewater v. Hoffman,* 24 Neb. 222; *Bradley v. Cramer,* 66 Wis. 297; *Ware v. Cartledge,* 24 Ala. 622; *Myers v. Malcolm,* 6 Hill, 292; *Palmer v. Haskins,* 28 Barb. 90; Townsh. Sland. & Lib. § 391; and, in any event, it should be shown by general reputation; citing *Stanwood v. Whitmore,* 63 Me. 209; and where the defendant is not the author of the libel, and so states in his paper, his

standing financially or otherwise is of no moment; citing *Storey v. Early*, 86 Ill. 461.

3. In support of the exception to the admission of testimony regarding plaintiff's exhibitions of feeling after commencement of suit, counsel cited *Railroad Co. Huntley*, 38 Mich. 537, and cases there cited; *Stockton v. Williams*, Walk. Ch. 133; *McPherson v. Ryan*, 59 Mich. 33, 38–40; 1 Greenl. Ev. § 131.

4. Plaintiff's counsel had no right to hold up the case of *Maclean v. Scripps* as a precedent for the jury to follow in assessing damages in this case; citing *Carne v. Litchfield*, 2 Mich. 340; *Scripps v. Reilly*, 38 Id. 10; *Seligman v. Ten Eyck*, 60 Id. 267; *People v. Montague*, 71 Id. 447.

5. Mental suffering as an element of actual damages has generally been limited to cases where the wrong is willful; citing *Daily Post Co. v. McArthur*, 16 Mich. 447; *Welch v. Ware*, 32 Id. 77; *Scripps v. Reilly*, 38 Id. 10.

*A. T. Lanphere* (*Austin Blair*, of counsel), for plaintiff, contended:

1. The plaintiff may call at the trial his friends or others to state that on reading the libel they at once concluded that it was aimed at the plaintiff; citing 3 Lawson, Rights, Rem. & Pr. § 1244, and cases cited in note; *Peoples v. Evening News*, 51 Mich. 11; *Finnegan v. Free Press Co.*, 78 Id. 659.

2. It is always competent to prove mental or physical distress, whether occurring before or after commencement of suit, the material question being whether it occurred in consequence of the injury, and not when it occurred; citing 3 Suth. Dam. 645, and cases cited in note 1; *Swift v. Dickerman*, 31 Conn. 294; *Newman v. Stein*, 75 Mich. 407; *Chesley v. Tompson*, 137 Mass. 136; 3 Lawson, Rights, Rem. & Pr. § 1303, and cases cited in note 7.

GRANT, J. Action of libel. Verdict and judgment for plaintiff for $1,000.

The libelous article was published in the Coldwater Republican, July 20, 1888, which newspaper was owned and published by the defendants. It reads as follows:

"A KENTUCKY SENSATION, IN WHICH ARE SOME COLDWATER PEOPLE.

"The following excerpts are taken from the Louisville, Ky., Commercial of July 18. All the parties are well known in this city.

"Lexington, Ky., July 17. Considering the many points of interest, the varied and suspicious movements of the principal actors, and the scandals which have arisen since investigation commenced, probably the suit for ejectment filed by Sidney Clay against B. S. Wright in the Bourbon circuit court, in which depositions have been taken, is the most sensational suit ever on docket in a court in central Kentucky.    *    *    *    *    *    *    *

" To get at the case it requires going back to a couple of years ago. At that time a gentleman with the haughty bearing of a lord, the style of a prince, the figure of an Adonis, and to all appearances an unlimited purse, made his appearance in the little Bourbon capital. As is usual, he said he was on the lookout for a fine bluegrass farm on which to place his superb stud of trotters, which was headed by the noted stallion Royal Fearnaught. Thus Mr. B. S. Wright made his advent into the county of Bourbon.   *   *   *   At last, however, he selected a place, which proved to be what is known as the ' Sidney Clay Home,' owned by the gentleman of that name, who is perhaps the wealthiest individual in Bourbon county. He informed Mr. Clay his place was the one he wanted, but he did not desire at that time to purchase it, as the locality might not suit him after a residence for a while in the neighborhood, but he was willing to lease it for a term of years, with the privilege of buying it at the expiration of the time stated. These terms suited Mr. Clay, and the lease was drawn up, the papers signed, and the key of the old homestead turned over to Mr. Wright. *   *   *   When he (Wright) got well settled in his new home, what has proved to be his side partner, a man named Ira H. Harris, arrived from Coldwater, Mich., and took up quarters at the farm. He was accompanied by two ladies, one of whom was Charles Harris' wife, while the other was a beautiful young girl of 15 years, named Miss Tory Osborne. From their advent in the neighborhood the scandal commenced, which promises to end only when all of the principal actors have bid fair Bourbon adieu. Hardly had they taken up their abode in the mansion on the farm before rumors of their conduct became noised about in that locality. It was at first thought to be only servants' gossip, but in a few months the affair culminated in the discovery being made that the fair young girl had succumbed to Harris' fascinations, and was unfortunately in an interesting condition.   *   *   *

Things were not in this condition long, as Ira G. Harris, at Wright's suggestion, induced a Mrs. Farons, a boarding-house keeper of Coldwater, Mich., to come out and run that part of the business. She too was accompanied by a young. lady, who proved to be her daughter, aged 18 years. Not long after they had taken up their quarters on the place another scandal developed,. as by some hook or crook it was discovered that Wright and Mrs. Farons were occupying the same apartment, while Harris and the daughter were doing likewise in another part of the building. This was carried on for some time, and then Wright and Harris had a falling out, which, however, did not develop until hostilities had ceased, when the gossipers found out that a change had come over the inmates of their notorious establishment, as Wright had taken up with the girl, while Harris and the old lady. had suddenly become to be on the most intimate terms. At this stage, like an apparation, Mrs. Farons' husband appeared on the scene. It was thought this would bring the crisis, but it failed to materialize; for if the old man made any discoveries he kept them to himself."

The defendants received by mail a copy of the Louis-ville Commercial, with this article marked, and published it the next day in their semi-weekly issue, as an item of news. The following week it was also published in the weekly issue of the paper. The plaintiff's name was Far-rand instead of Farons. Shortly after the appearance of the article in defendants' paper, and on the same day, a brother of the plaintiff went to the defendants, informed them that he was plaintiff's brother, that plaintiff had not been in Kentucky, and demanded a retraction of the article. On July 27 the defendants published in their paper the following:

"The brother of Bertha Farrand, whose name was men-tioned in the Louisville (Ky.) Commercial, which was copied last week Friday in this paper, says that his sister is here, and has been here. If this be. so, the Commer-cial made a great mistake, which we presume it would willingly rectify were its mistake made known to it, as

no journal will willfully do any person, and certainly not a young woman, a wrong."

On July 31 the following appeared in defendants' paper:

"Notwithstanding the spirit of fairness which the Republican has exhibited towards Miss Farons, who is an entire stranger to us, and our readiness, expressed July 20 to the man who claimed to be her brother, to publish any statement in explanation of the facts in the case as he saw them which he might wish to make (which offer he has refused), the party aggrieved, with A. T. Lanphere as attorney, has seen fit to serve papers upon A. J. Aldrich & Co. for trespass on the case in the sum of $5,000. At our solicitation, a friend saw Mr. Ben Wright, in Detroit, during the races last week, and interviewed him as to the statements made in the Louisville (Ky.) Commercial article of July 18, extracts from which were copied into the Republican of July 20. He states that the article is a piece of spite work on the part of his landlord and of the reporter for the paper, and declares that the statements made in the Commercial were false, both as regarding himself and other persons named."

Plaintiff had lived with her father and mother in Coldwater, who had kept a boarding-house very near the publication office of the defendants' paper. They gave up the boarding-house in March, 1888, the father and mother going to Kentucky, and the plaintiff going to live with an uncle in St. Joseph county.

The plea was the general issue, with notice of justification; that the article was published in good faith; that, if false, it was due to mistake, which was corrected in the next issue of the paper; and that defendants offered to publish a correction of the same in as conspicuous a manner and place in their paper as was the article sued upon, if any one desired it to be done.

In reply to special questions, the jury found that the defendants were not actuated by any malice in the pub-

lication, and that they had no malice towards the plaintiff when the article was published.

1. The first allegation of error is that the court erred in allowing the following question to one of the plaintiff's witnesses:

"When that article appeared, and your attention was called to it, to whom did you think at the time it referred?"

The authorities are not agreed as to the admissibility of such evidence. The defendants insist that the jury should have determined this question from the article itself. Probably, in this case, the jury would have found no difficulty in determining from the articles themselves that the plaintiff was meant, for in the second article her name is spelled correctly. It is difficult, if not impossible, to lay down a rule applicable to all cases. Each case must very largely depend upon its own peculiar circumstances. This will clearly appear from an examination of the numerous decisions involving the question. In the present case the name was misspelled, but in sound was very similar to the correct name. Under these circumstances, we think it was competent to show by persons living in the vicinity, and who read the article, that they understood it to refer to the plaintiff. If this were not so the admission of the testimony in this case could not be a reversible error, because there is no doubt from this record but that the plaintiff was the person referred to. 13 Amer. & Eng. Enc. Law, 486; 3 Lawson, Rights, Rem. & Pr. § 1244, and authorities there cited.

2. The court, under objection, permitted evidence of the extent of the circulation of defendants' paper in February following the publication. We do not think this was so remote as to render it incompetent. In this respect do definite rule can be laid down. Proof cannot be limited to the number circulated on the date of

publication.  The witness testified that, in February fol-
lowing, defendant Aldrich told him that the circulation
of his weekly was about 1,800, and of his semi-weekly
about the same.  The difficulty in such case for the
plaintiff to procure evidence is apparent, unless the
defendants be made her own witnesses.  Can it be said,
as a matter of law, that this was no evidence of the
extent of the circulation six months previous?  We think
not.  It was peculiarly within the power of the defend-
ants to show the extent of their circulation.  Consider-
able latitude should certainly be allowed plaintiffs in
libel suits to make out a *prima facie* case in this respect.

3.  Plaintiff introduced the assessment rolls of the town-
ships and wards in which the defendants were assessed.
These were introduced and admitted for the purpose of
showing the standing of the defendants.  The case of
*Brown v. Barnes,* 39 Mich. 211, is relied upon as author-
ity for the admission of this evidence.[1]  The danger of
admitting such evidence was recognized in that case, and
it was there stated that there was reason for admitting
it, with proper caution to the jury by the court.  No
cautions were given them in this case, nor was the sub-
ject mentioned by the court in its charge, but its pur-
pose and object were fully stated at the time of the
admission of the evidence.  But this testimony was ob-
jectionable on another ground.  It is not competent to
enter into the details of the finances of a defendant in
a libel or slander suit.  The inquiry should be directed
to his financial standing in the community.  Though he
may be possessed of considerable wealth, yet, if this be
not generally known in the community, no greater injury
can on that account be said to flow from the publica-
tion of the libel or utterance of the slander.  It is his

[1] In this case the defendant was allowed to be asked concerning
his pecuniary circumstances at the time of the slander.

reputed, not his actual, standing that bears upon the injury.

But the verdict in this case is so small that we do not think the jury could have been prejudiced by the admission of the testimony. Here was a charge of the grossest immorality published against a young woman, against whose character the record does not cast even a suspicion. The publication of such an article without investigation, when a brief investigation would have reached the truth, is unwarranted. We do not, therefore, think the case should be reversed on this ground. Reputations, especially those of young women, are not to be thus lightly treated by publishers of newspapers in their desire to issue a newsy and spicy paper, and to publish scandal to suit the taste of their readers. Such publications cannot be defended nor protected, when published without taking any steps whatever to ascertain the truth of the accusations made, especially when the truth is so easily within reach.

4. Testimony was received of the conduct, exclamations, and acts of the plaintiff when she first read the article. No testimony was offered as to what she said afterwards, but her uncle and aunt, with whom she lived the most of the time up to some time in September, testified to her appearance and conduct during that time, and that they often heard her cry and sob in the night. The testimony was competent, and the judge very carefully instructed the jury in regard to its consideration and effect.

5. It is alleged as error that counsel for plaintiff, in his argument to the jury, alluded to the case of *Maclean v. Scripps*, 52 Mich. 214, on the question of damages. The record does not disclose what was said, and therefore we cannot consider it. In such cases, the language

used must be given in the record in order to make it a basis for error.

6. The next assignment of error is based upon the refusal of the court to give the following requests:

"1. You will regard with great caution all testimony given as to the condition and state of mind or feelings of the plaintiff since July 31, 1888, and consider whether her actions and expressions, claimed as indicating her condition, were not made under a strong temptation to feign suffering, or to imagine or exaggerate her feelings, and whether she had not in her mind just what expressions her cause required to make it a success.

"2. Declarations or actions, to be of much service as to the mental condition of a party or the alleged suffering of the plaintiff in this case, should be the natural effusions of one upon an occasion when her mind stands in an even position, and without any temptation to exceed the truth.

"3. To give her declarations or actions any other force after the commencement of the suit would open the door for the fabrication of testimony, which you cannot be too careful in guarding against."

Upon this subject the court charged the jury as follows:

"As bearing upon the question of extent of the injury inflicted, the court has permitted evidence to go to you from the friends of the plaintiff as to what her appearance and conduct were subsequent to the commencement of this suit, and prior to her return to Coldwater from Klinger Lake, in September. It becomes the duty of the court to say to you that these appearances and this conduct having been observed after the commencement of the suit, and while the plaintiff was under the temptation to exaggerate her injury and the damages she might be able to recover in this action, for this reason this evidence should be carefully considered by you, and if you find such appearances and conduct to have been simulated, or in so far as you may find them to have been simulated, if at all, and not to have been the outward and natural expression of real suffering, they should be disregarded by you. If, however, such appearances and conduct were

but honest expressions of true suffering, and the result of the publication in question, or in so far as they are found by you to be real, and not simulated or exaggerated, you should give such evidence its fair weight in determining the character and extent of the injury, if any, which the plaintiff has suffered from the publication."

This charge of the judge was entirely fair, and covered the whole ground. The requests were objectionable, in that they referred to declarations on the part of the plaintiff made subsequent to the time when she first read the article. There was no evidence of any such declarations. The testimony was all directed to her appearance and conduct. It was no error to refuse these requests.

7. At the request of defendants, the court charged, in regard to the failure of the plaintiff to be a witness in her own behalf,[1] as follows:

"A presumption obtains, however, that a party will call such witnesses as have knowledge of facts favorable to himself, and are readily accessible; and a failure to call a witness readily accessible, who has knowledge of facts in issue, is presumed to be because the witness would not support the claim of the party so failing to call him, unless it further appears that the witness for some reason is hostile to the party upon whom otherwise the duty would be to call him."

To this the court added:

"This is but a presumption, however, and any reasonable explanation found in the evidence for such failure to call the plaintiff should dispel the presumption."

To this latter instruction by the judge defendants' counsel object, because they say that there was no attempt at any such explanation in the evidence. The obvious reply to this is that there was no fact in issue to which it was material and necessary to call the plaintiff. Her conduct was not assailed; the charge against her was

---

[1] See *Cole v. Railway Co.*, 81 Mich. 156 (head-note 2).

admittedly a pure fabrication. The only real question left for the jury was one of damages. Her conduct and appearance at the time and afterwards were far better evidences of her feeling than anything she herself might testify to, even if her own evidence on that point were admissible. The charge was certainly as favorable to the defendants as they are entitled to.

8. The jury were instructed upon the measure of damages that plaintiff was entitled to recover for injury to her feelings, character, and reputation; for humiliation, shame, and disgrace which the publication brought upon her; and for illness of body and worry of mind. Defendants insist that the jury having acquitted the defendants of malice, and therefore of willfulness, in the publication, mental suffering is not an element of actual damage. If this were the rule, one of the principal elements of damage would be excluded. If a virtuous young woman is entitled to no consideration for her injured feelings when she has been publicly charged with the grossest immorality, courts might as well deny her a cause of action. Nor do we think it was error to charge the jury that they might consider the effect that such a publication would have upon her in the future.

Judgment affirmed.

The other Justices concurred.