THE PEOPLE OF THE TERRITORY OF UTAH, RESPONDENT, *v.* ELMER E. RITCHIE, APPELLANT.[1]

1. CRIMINAL LIBEL.—INDICTMENT.—ALLEGATIONS BY WAY OF INDUCEMENT.—EVIDENCE.—2 Comp. Laws 1888, § 3246 provides that it is not necessary to allege extrinsic facts for the purpose of showing the application of the defamatory matter to the party libeled, but that it is sufficient to state generally that the same was published or spoken concerning him, and if such allegation be controverted, he must establish on the trial, that it was so published or spoken. *Held*, that without alleging in the indictment by way of inducement, the circumstances surrounding the publication of the libel, it was proper to show that by using the name of the party libeled as part of the name of a fictitious corporation, defendant intended to refer to him as the manager of another corporation in the same business, the evident purpose being to insinuate, if not directly charge, that

---

[1] Rehearing denied Dec. 9, 1895.

he so dominated the company as to make it a creature of his will, and that certain other words used in the publication were understood to mean the party claimed to be libeled.

2. ID.— ID.— EVIDENCE.— HARMLESS ERROR.—Where the person sought to be libeled is designated in an ambiguous manner, testimony may be given that the publication was understood to mean the person alleged to be libeled, but if the admission of this evidence is error, it is harmless, where the record conclusively establishes the fact that the person claimed to be libeled, is the person referred to in the article.

3. ID.—ID.—ID.—ENMITY MAY BE SHOWN TO PROVE AUTHORSHIP OF LIBEL.—In a prosecution for libeling a person in the management of a corporation, it is proper to show defendant's enmity toward such person at directors' meetings, and that it grew out of their relation to the corporation, as tending to prove defendant's authorship of the libel, and that it was such person to whom reference was made in the publication.

4. ID.—ID.—ID.—WHEN WITNESS MAY STATE HIS CONCLUSIONS.— It is not error for a witness to state that defendant and another person "acted together" at directors' meetings, since his conclusions are drawn from his observations, and it is difficult for him to state in detail the different facts and circumstances leading to the conclusion.

5. ID.—ID.—SUFFICIENCY OF EVIDENCE TO SUSTAIN CONVICTION.— LIBELOUS LETTER.—2 Comp. Laws 1888, § 4489, defines libel to be " a malicious defamation * * * tending * * * to impeach the honesty, integrity, virtue or reputation * * * of one who is libeled, and thereby expose him to public hatred, contempt or ridicule." *Held*, that a conviction of criminal libel is sustained by evidence that defendant circulated a letter capable of the construction that the person libeled was guilty of maladministration of the affairs of the corporation, and that in order to conceal the same, resort was had to fraudulent practices.

6. MISCONDUCT OF JURY.—AFFIDAVIT OF JUROR.—IMPEACHMENT OF VERDICT.—An affidavit of a juror that during the progress of the trial, he took certain measurements of a locality testified to on the trial, and that he communicated the same to the other jurors, cannot be received to impeach the verdict, as such impeachment is impliedly prohibited by 2 Comp. Laws 1888, § 3400, subd. 2, granting a new trial on affidavits of

jurors only when they have been induced to assent to a ver-
dict by resort to chance.

7. CONSTITUTIONAL LAW.— ACTS OF THE TERRITORIAL LEGISLA-
TURE.—RIGHTFUL SUBJECTS OF LEGISLATION.—LAWS ADOPTED
FROM ANOTHER STATE TAKEN WITH THE CONSTRUCTION PLACED
UPON THEM.—FEDERAL DECISION WHEN NOT BINDING.—Laws
enacted by the territorial legislature "upon all rightful sub-
jects of legislation," so long as they do not infringe the con-
stitution of the United States, or violate the laws of Congress.
applicable to the territory, are supreme and binding upon the
territorial courts, and where the territorial legislature has.
adopted portions of the code of a neighboring state, which
had previously been construed by the supreme court of such
state, it takes them with the construction placed upon them,.
and is not bound to follow a decision of the Federal Supreme
Court on the construction of the same statute determined on
appeal from a state other than the one from which the law
was adopted.

(No. 599.   Decided Nov. 6, 1895.   42 P. R. 209.)

APPEAL from the District Court of the Third Judicial
District.   Hon. George W. Bartch, *Judge.*

Elmer E. Ritchie was convicted of criminal libel and
fined $100 and costs.   From the judgment and order over-
ruling his motion for a new trial he appeals.   *Affirmed.*

*Messrs. Williams, Van Cott & Sutherland,* for appellant..

The indictment contains no allegations by way of induce-
ment of the circumstances surrounding the publication of
the libel, and employment of McGurrin, or any other
extrinsic facts to indicate or give meaning to the sev-
eral phrases contained in the circular.

The pleader attempts to point the meaning of such
phrases as the "McGurrin Building & Loan Association,"
"The Present Proprietor," "The Gorilla-faced Boss,"
"The Buzzards Who Boss It," "The Boss," and other

such phrases, by innuendo only. It is well settled that the meaning of such phrases cannot be extended by innuendo in the absence of allegations of facts and circumstances by way of inducement; so that the testimony of witness Savery was not proper under the allegations of the indictment. Newell on Def. & Slander, p. 621, subd. 4, p. 623, subd. 15; 41 N. W. R. 495.

It was error for the court to permit the witness Savery to testify as to his understanding of these phrases. A witness may testify to the publication of a libel, together with all the attending circumstances and connections, the existing facts, and after having done so, it is for the jury to determine, from the evidence, who was meant and what was meant. Newell, p. 308, § 33, *et seq.*

Does this circular tend to impeach the honesty or integrity of McGurrin or his reputation for honesty or integrity? We insist that it does not. It discusses, it is true, in forcible language, the failing character of the association which it is directed against; it refers to it as a "consumptive institution." It speaks of the present proprietor and his clerk having fastened their clutches upon it; some person is denominated a "gorilla-faced boss," "the boss," the managers are spoken of as "the buzzards who boss it;" it declares that a profit has been made by carrying real estate at its cost which is not worth fifty cents on the dollar, and that the assets have been padded in this way.

With the exception of this latter statement, it is perfectly clear that the other language referred to is mere abuse and scurrility. No attack is made on the honesty or integrity of any person; at most there is an intimation of lack of business ability. It is said there will only be about 75 shares at the annual meeting in March and that the boss ought to be able to handle these; it is about the size of his capacity.

It is not libel *per se* nor a criminal libel, to disparage the works or goods of another or to use abusive or scurrilous language, no matter how strong. *People* v. *Jerman*, 1 Mann. (Mich.) 142; *Swan* v. *Tappan*, 5 Cush. 104; Newell on Def. p. 939.

One of the grounds of the motion for a new trial was that the jury were guilty of misconduct by which a fair and due consideration of the case was prevented. A juror made affidavit that during the trial of the case, he and two other jurors went into the postoffice and measured the distance between where they supposed, from the testimony, that McGurrin and Kinney were, to where the defendant was supposed to be at the time of mailing the letters, making the distance some 12 or 14 feet. The The result of their measurements they communicated to other jurors and suggested to them that they also go down to the postoffice. The misconduct of the jurors consisted in two things; *first*, the private examination and measurements at the postoffice; and *second*, the communication of what they there learned, to other jurors in the case. The general rule is stated in Thompson & Merriam on Juries, § 417: "It is well settled that jurors must decide cases upon such evidence as is produced before them by parties to the litigation, and they cannot go in search of evidence privately or act upon evidence thus obtained."

In the case at bar, even if it would not be error for one or more of the jurors to make a private inspection of the premises, a proposition which we do not concede, it was clearly beyond the warrant of the court's permission to view the premises, to make the measurements and report the result to the other jurors. *Ortman* v. *U. P. Ry. Co.*, 4 Pac. 858. See, also: *People* v. *Thornton*, 16 Pac. 244; *People* v. *Bush*, 10 Pac. 169; *State* v. *Clark*, 8 Pac. 528; *People* v. *Stokes*, 103 Cal. 193; 2 Thomp. on Trials, § 2605. The misconduct being shown, the presumption is

that defendant was injured if it is of such a nature that prejudice might have resulted from it; and unless this presumption is rebutted by the successful party, a new trial should be granted. 2 Thomp. on Trials, § 2617.

"A juryman may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind." *Woodward* v. *Leavitt,* 107 Mass. 466. The question, however, is set at rest by the late decision of the supreme court of the United States. *Mattox* v. *U. S.,* 146 U. S. 140. The rule under discussion, and its limitations are there announced by the court. That decision is conclusive upon this court. The court follows the decision of Judge Brewer in *Perry* v. *Bailey,* 12 Kan. 539, 545, and of Justice Gray, in *Woodward* v. *Leavitt,* 107 Mass 453, and while a juror may not give evidence as to the motives and influences which affected his deliberations, to impeach' or support his verdict, he may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

We do not contend that the determination of the jury upon the facts can be set aside by this court. We insist, however, that the evidence in the case clearly brings McGurrin, the prosecuting witness, within the operation of the maxim, *volenti fit injuria.* The conclusion is irresistible from the testimony that if the defendant was guilty of preparing and publishing the circular complained of, it was with the knowledge and active co-operation of at least one of the parties employed by McGurrin to assist in fastening the guilt upon him.

"When detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only

reprehensible, but criminal, and ought to be rebuked rather than encouraged by the courts; and accepting the version of the witness Holliday, as true, it shows a state of facts that can have no place in the recent administration of justice." *Connor* v. *People*, 33 Pac. 161. The court reversed the conviction without ordering a new trial. And see: *Spciden* v. *State*, 3 Tex. App. 153; 1 Wharton Crim. Law, §§ 141, 149; 3 Am. & Eng. Enc. Law, pp. 662–667; *U. S.* v. *Adams*, 59 Fed. 674; 26 Pac. 476 (44 Kan. 618).

*Mr. Andrew Howat*, Assistant United States Attorney, for the people.

KING, J.:

Defendant was convicted of criminal libel, and appeals from the judgment and order denying his motion for a. new trial. The indictment charges that the defendant, intending " to impeach the honesty, integrity, and reputation of Frank E. McGurrin, and thereby expose him to public hatred, contempt, and ridicule, did then and there deposit the said circular, inclosed in an envelope, with postage prepaid thereon, addressed to ' Charles D. Savery, City,' in the postoffice in Salt Lake City, together with other printed circulars, in the same words and figures, in other envelopes, with postage prepaid thereon, addressed to other persons," etc. The circular referred to is set out in *hæc verba* in the indictment, and is as follows: " My Friend: If you are a stockholder in the McGurrin Building and Loan Association, permit us to engage your attention for a moment. We invite you to take a brief view of the so-called ' financial statement' emitted by this consumptive institution since the present proprietor and his clerk fastened their clutches upon it last September. On the 30th of that month the concern claimed 2,181 shares; on Dec. 31st, they mustered 1,850; on March 31, they

boasted of only 1,454; on June 30th, they showed up just 1,076, including dead stock, which should have been canceled long ago. You will notice the regularity of their skate down the grade from 350 to 400 shares a quarter. They have dropped 1,104 in nine months, or more than half. the number they started with. At the same rate, the gorilla-faced boss will round up about 75 shares at the annual meeting in March. He ought to handle that number very well. It is about the size of his capacity. Observe, also, that between September and June the total resources (?) dropped from $77,685 to $50,076, the loans from $65,160 to $37,660, and the capital stock from $51,- 295 to $34,269. They have declared a profit of 5 per cent. in nine months, which is done by carrying at their cost about twenty loans and pieces of real estate which are not worth 50 cents on the dollar. In this way they paid the assets about $5,000. The stockholders who get out in the next two or three months will not have to share in that loss, when it is admitted, as it must be at the end of the present quarter. The whole mess will smell so rank by the end of September that no more statements will be printed, and the buzzards who boss it will carry off the remains. The expense item shows $320 for three months,—more than double the cost of running the Pioneer Association, which has 1,500 shares, and whose secretary receives less than half the salary of McGurrin's clerk, and manages a paying institution instead of a sinkhole. They are more than a year behind on withdrawals, and their ordinary income has shrunk to such slim proportions that they pay very little withdrawing stock except when a loan is returned. They have ten thousand dollars in loans upon which little, if anything, has been paid for a year past. The boss fears to foreclose, because if they reduce the loans, and carry the real estate at its

true value, most of the profit of years would be knocked out. The condition of the association is so well understood that it has sold no new stock for months past, as shown by the fact that a new series has not been opened since October 23d. Each hour a stockholder stays in he imperils his interest, whether he be a borrower or investor. You can figure for yourself that Series A will run over seven years, and each succeeding series will run longer than its predecessor. Take our advice, boys, and come out while there is yet time. Board of Health."

Six grounds are urged for a reversal of the case. These we will consider in the order of their presentation.

1. It is claimed that the indictment contains no allegations by way of inducement of the circumstances surrounding the publication of the libel, and the employment of McGurrin, or any other intrinsic facts to indicate or give meaning to the phrases contained in the circular, and that, therefore, it was error to permit the witness, in answer to questions, to state that he understood the words "gorilla-faced boss," "boss," "buzzards," "present proprietors," etc., to refer to McGurrin, and the words "McGurrin Building and Loan Association" to mean the Salt Lake Building & Loan Association. 2 Comp. Laws Utah, § 3246, provides that it is not necessary to allege extrinsic facts for the purpose of showing the application of the defamatory matter to the party libeled, but that it is sufficient to state generally that the same was published or spoken concerning him, and such fact may be proved on the trial. The indictment having pointed by proper innuendo the meaning of the phrases alleged to be libelous, and without deciding what the rule would be in the absence of a statutory provision of the character just referred to, we think the existence of such a provision dispenses with the necessity of recitals of extrinsic facts by

way of inducement or otherwise. And this is equally true of the testimony of the witness wherein he stated his understanding of the meaning of the words "McGurrin Building and Loan Association," for the reason that it is clear that the corporation was not libeled; and, although the name McGurrin was applied to it, the corporation was not intended to be designated, nor was the circular directed against it. The evident purpose was to insinuate, if not directly charge, that some person so dominated the company, as to make it the creature of his will. The publication complained of was ambiguous as to the person intended to be charged with the acts mentioned in the circular. That being true, the question arises, can a person who has read the article testify whom he understood was meant? Some cases hold that the witnesses may be asked to explain in what sense they understood the language used which is complained of as libelous. Other authorities maintain that it is not proper for a witness to testify as to his understanding of the language employed, except that he may name the person understood by him to be referred to. We think the weight of authority supports the view that when the person sought to be libeled is designated in an ambiguous manner, testimony may be given that the publication was understood to mean the person alleged to be libeled. 2 Greenl. Ev. § 417; *Nelson* v. *Borchenius,* 52 Ill. 236; *Smith* v. *Miles,* 15 Vt. 245; *Russell* v. *Kelly,* 44 Cal. 641; 2 Starkie, Sland. & L. 51, 321; *Smart* v. *Blanchard,* 42 N. H. 146; *Miller* v. *Butler,* 6 Cush. 71; *Leonard* v. *Allen,* 11 Cush. 241; *Farrand* v. *Aldrich* (Mich.), 48 N. W. 628. However, if the admission of this evidence was error, it was harmless, because the record before us conclusively establishes the fact that Frank E. McGurrin was the person referred to in the article. *Farrand* v. *Aldrich, supra;* 13 Am. & Eng. Enc. Law, 486; 3 Lawson, Rights, Rem. & Prac. 1244.

2. It is claimed that the court erred in allowing witnesses to testify to the cause of defendant's ill feeling towards McGurrin, and to threats and abusive language applied by the former to the latter. McGurrin and other witnesses testified that at meetings of the directors of the corporation controversies arose between the defendant and McGurrin, growing out of the latter's management of the association, and that the defendant not only made threats against McGurrin, but upon one occasion assaulted him. We do not think it was a conclusion for the witness to state these causes as the ground of defendant's ill feeling towards McGurrin. As it was contended by the prosecution that the article was directed against McGurrin and his management of the association, and was intended to libel him, it was proper to show that defendant's enmity grew. out of their relation to the association, as tending to prove his authorship of the circular, and also that McGurrin was the person to whom reference was made. It was proper to show the relations of the parties, and their feelings towards each other, so far as the same tended to throw light upon the authorship of the alleged libel, and the person intended to be libeled.

3. Witnesses for the people testified that in meetings of the directors of the association, and in the business matters of the company, defendant and one Blazer acted together. This, it is claimed, was the statement of a mere conclusion. It is not error for a witness to state his conclusions when they are drawn from his observations, and it would be difficult for him to state in detail the different facts and circumstances leading to the conclusion. A witness may testify that persons walked together or rode or acted together. In *Hopt* v. *Utah,* 120 U. S. 437, 7 Sup. Ct. 614, the court say: "The opinions of witnesses are constantly taken as to the result of their observations on a great variety of subjects. All that is required in such

cases is that the witnesses should be able to properly make the observations the result of which they give, and the confidence bestowed upon their conclusions will depend upon the extent and completeness of their examinations and the ability with which they are made." Bradner, Ev. 404–407.

4. Appellant next contends that the circular set forth in the indictment is not a criminal libel. 2 Comp. Laws, § 4489, defines a libel to be a "malicious defamation * * * tending to * * * impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby expose him to public hatred, contempt or ridicule." The trial court fully and fairly instructed the jury what constituted the offense of criminal libel, and further stated that if they found "that the circular in question does not charge the witness McGurrin with dishonesty, or lack of integrity, or attack his reputation in these respects, it is not libel, and you will acquit the defendant. Mere abusive language or vile epithets or scurrility is not criminal libel of itself." The law was correctly stated by the court, and the question arises, is the article alleged to be libelous capable of receiving a construction that would bring it within the terms of the statute just referred to? The rule which once prevailed, that words are to be understood in *mitiori sensu*, has long since been superseded; and words are now to be construed by courts, as they always ought to have been, in the plain and popular sense in which the rest of the world naturally understood them. Now, the only question for the judge of the court is whether the words are capable of the defamatory meaning attributed to them. If they are, then it is for the jury to decide what is in fact the construction. Newell, Defam. p. 304. And "where language may be taken in a double sense, the court, after verdict, will usually construe it in that sense which will

support the verdict. * * * After verdict for plaintiff, language which admits of an innocent and an injurious meaning will be construed to have its injurious meaning." Townsh. Sland. & L. 143. We think the circular in question is susceptible of the construction contended for by the prosecution, and that it tends to impeach the honesty and integrity of McGurrin. It is not only capable of the construction that McGurrin was guilty of maladministration of the affairs of the association, but also that, in order to conceal the same, resort was had to fraudulent practices, such as "padding" the accounts. The evident purpose is to impute to McGurrin fraudulent conduct in the business management of the company, and a criminal desire to disrupt the association, and by criminal means secure its assets.

5. Witnesses for the prosecution testified that they were standing inside the postoffice, and saw the defendant, about 10 o'clock p. m., come into the lighted rotunda of the office, and post a bundle of circulars. Defendant denied that he posted them, and other witnesses corroborated his statement. On motion for a new trial, defendant's counsel offered the affidavits of jurors to the effect that, during the progress of the trial, they had gone into the rotunda of the postoffice, and made certain measurements by "stepping," with a view of ascertaining the distance between the points where the people's witnesses testified they were standing and the place they alleged defendant was standing when he mailed the circulars. The distance, they determined, was 12 or 14 feet, and this information they communicated to the other jurors. This, appellant claims, is such misconduct upon the part of the jury as to entitle him to a new trial. From the record it appears that the jury, in the manner provided by statute, visited the postoffice while the trial was in progress; and a perusal of the record would seem to indicate that the measurement made by the

jurors in no wise would militate against the defendant. But, admitting that it was very prejudicial to him, are affidavits of jurors admissible to impeach their verdict? In 1878 this territory adopted the California criminal procedure act, and one of the grounds enumerated upon which a new trial could be granted was "when the jury has received any evidence out of court, other than that resulting from a view of the premises." 2 Comp. Laws, § 5094. In 1884 we adopted the Code of Civil Procedure of California, and it is there provided that the misconduct of the jury shall be ground for a new trial, and that such misconduct may be proved by the affidavit of any juror "whenever any one or more of the jurors have been induced to assent to any general or special verdict * * * by a resort to the determination of chance." 2 Comp. Laws, § 3400, subd. 2. Appellant insists that this provision is one of limitation, and, because the same restriction is not found in the criminal procedure, the court may receive the affidavits of jurors to impeach their verdict, even though it was not reached by resort to chance. Until 1862, the sections of the civil and criminal procedure act of California relating to this point contained the same language. They were the same as section 5094, above quoted. In that year the legislature of that state amended the Civil Code so as to permit verdicts to be attacked by affidavits of jurors when they had been determined by chance. These provisions had been repeatedly construed by the supreme court of California prior to their adoption by this territory; and the rule is that, where a statute has been adopted from another state, it will be deemed to be taken with the settled construction given it in the state from which it is copied. *Coulter* v. *Stafford*, 48 Fed. 266; *McDonald* v. *Hobey*, 110 U. S. 619, 4 Sup. Ct. 142; *Stutsman Co.* v. *Wallace*, 142 U. S. 293, 312, 12 Sup. Ct. 227; Suth.

St. Const. § 256. The construction given to these provisions
was that it "is a settled rule, founded upon considerations of
necessary policy, that the testimony of a juryman cannot
be received to defeat his own verdict." *People* v. *Baker,*
1 Cal. 405; *Amsby* v. *Dickhouse,* 4 Cal. 103; *Castro* v. *Gill,*
5 Cal. 42; *Wilson* v. *Berryman,* Id. 45; *People* v. *Wyman,*
15 Cal. 75; *People* v. *Gray,* 61 Cal. 164; *People* v. *Deegan,*
88 Cal. 602, 26 Pac. 500; *People* v. *Murray,* 94 Cal. 212, 29
Pac. 494; *People* v. *Stokes,* 103 Cal. 193, 37 Pac. 207;
*People* v. *Azoff* (Cal.) 39 Pac. 60. In 1862, while the leg-
islature of California was in session, some scandal arose
concerning the verdict of a jury, which it was asserted had
been reached by resort to chance, and the Civil Code was
amended so as to permit the use of affidavits of jurors to
attack verdicts reached by chance. *Boyce* v. *Stage Co.,* 25
Cal. 477. And in the case last cited it was held that, the
legislature having declared in what cases verdicts may be
impeached by affidavits of jurors, upon the maxim. *"Ex-
pressio unius, exclusio alterius est,"* had declared that in
no other cases could verdicts be so impeached. From that
time the courts of California have permitted verdicts to
be impeached by affidavits only when they had been deter-
mined by chance, and, while the amendment of 1862 was
to the Civil Code only, it has, without comment or seem-
ing dispute, been extended to criminal cases. So that
section 5094, adopted in 1878, came to us with a judicial
construction which absolutely prohibited the impeachment
of verdicts by jurors' affidavits, except in cases when chance
had been resorted to. *Griffiths* v. *Montandon* (Idaho), 39
Pac. 548. But counsel for defendant say that a different
rule has been announced in the case of *Mattox* v. *U. S.,*
146 U. S. 140, 13 Sup. Ct. 50, and that this case is bound
by the decision of that tribunal. That case was appealed
from the district of Kansas, and the rule established by

the supreme court of that state was followed.    The Supreme Court of the United States held that affidavits of jurors may be received when they tend to prove something which does not essentially inhere in the verdict,—an overt act, open to the knowledge of the jury, and not alone within the personal consciousness of one.    Passing by the question as to the localized character of this decision by reason of the court following the rules of the state, and without attempting to indicate the class of decisions by the United States Supreme Court from which this court cannot escape, attention is called to the doctrine (so fully recognized as to need no citation of authorities) that this territory, upon all rightful subjects of legislation, is supreme.    Its legislature may adopt codes, prescribe rules of pleading and practice, and, so long as they do not infringe the constitution of the United States, or violate the laws of Congress applicable to the territory, they are binding upon the territorial courts.    Concerning the question under discussion, the legislature spoke.    In adopting the sections from California, above quoted, the legislature took them with the construction placed upon them by the courts of that state.    In effect the legislature enacted that no verdict could be impeached by affidavits of jurors, except when chance had been resorted to in its determination.    If there had been no legislation by the territory upon the subject, the case of *Mattox* v. *U. S., supra,* would have controlled; but it is clear from numerous decisions that, the territory having spoken upon this question of procedure, its declaration is conclusive.    *Reynolds* v. *U. S.,* 98 U. S. 153; *Clinton* v. *Englebrecht,* 13 Wall. 434; *Hopt* v. *People of Utah,* 110 U. S. 574, 4 Sup. Ct. 202; *Hornbuckle* v. *Toombs,* 18 Wall. 648.

6. While the appellant claimed that the verdict was contrary to the evidence and against law, in the brief of his counsel it is admitted that the evidence was conflicting, and the determination of the jury upon the facts

cannot be set aside by this court. But it is urged that the evidence brings the prosecuting witness, McGurrin, within the letter and spirit of the maxim, "*Volenti non fit injuria.*" We have carefully examined the record in the case, and find that there was no inducement for the defendant to commit the crime. He was not solicited to write or mail the libelous circulars; indeed, it was not even suggested to him. From information conveyed to McGurrin it was believed by him that the defendant designed to publish a libel. A detective was employed. The defendant was watched, and every step taken which was thought necessary to detect him if he committed the offense. He was detected by the means employed by and through the efforts of McGurrin and other members of the association. See *Grimm* v. *U. S.*, 156 U. S. 604, 15 Sup. Ct. 470. We see no error in the record, and remand the case, with directions that the judgment of the lower court be enforced.

MERRITT, C. J., concurs.