MAX E. POLLASKY AND FRANK E. POLLASKY v. GEORGE
H. MINCHENER, IMPLEADED WITH ROBERT
G. DUN.

*Libel and slander—Mercantile agencies—Privilege—Liability for
publication.*

1. Qualified privilege extends to all communications made *bona
   fide* upon any subject-matter in which the party communicat-
   ing has an interest, or in reference to which he has a duty,
   to a person having a corresponding interest or duty; and
   embraces cases where the duty is not a legal one, but is of a

moral or social character, of imperfect obligation; citing *Bacon v. Railroad Co.*, 66 Mich. 170, and cases cited.

2. A mercantile agency does not stand in such a relation, either of interest or duty, with its subscribers *generally*, that communications made to them *generally* are privileged. Exceptions exist in relation to those persons who are interested in obtaining the *particular* information, and to whom it is furnished upon *special* request; and to this extent, and no further, are such communications protected by a *qualified* privilege.

3. In this case the general manager of a district of the business of a mercantile agency, who had authority to employ and discharge clerks, and who, in addition to his salary, received a further compensation measured by the amount of business done, and to whom all reports from correspondents were directed, which were generally opened by his chief clerk, who sent out the notification sheets to customers of the agency, was sued for incorporating therein a false report that the plaintiffs had chattel-mortgaged their stock of goods. The notice from the local correspondent stated that the mortgage was given to a certain bank in the city where the manager was located, and the chief clerk, knowing that there was no such bank in the city, wrote to the correspondent advising him of such fact, and requesting him to investigate and report, but, without waiting for an answer, sent out the notification sheet containing the information received from the correspondent, and in addition advised prompt action on the part of creditors. And it is held that there was testimony in the case sufficient to be submitted to the jury upon the question whether the manager published, or caused to be published, the report alleged to be libelous.

Error to Wayne. (Gartner, J.) Argued May 14, 1890. Decided June 6, 1890.

Case. Plaintiffs bring error. Reversed. The facts are stated in the opinion.

*Henry M. Duffield,* for appellants.

*Dickinson, Thurber & Stevenson,* for defendant.

[The contention of counsel, and the authorities, are so fully discussed in the opinion that a restatement from their briefs is omitted.—REPORTER.]

CHAMPLIN, C. J.    The plaintiffs sued Minchener and Robert G. Dun to recover damages for a libel published by the R. G. Dun & Co. Mercantile Agency, of which Minchener was the general manager of a district in Michigan, of and concerning the plaintiffs.

Max E. Pollasky and Frank E. Pollasky composed the firm of Pollasky Bros., carrying on mercantile business at the village of Alma, Gratiot county, Mich. They had been engaged in business at that place since 1882. They were in good credit, and had never filed or placed a chattel mortgage upon their property, and in carrying on their business bought mostly upon credit, and had established a business reputation for prompt payment of their bills.

R. G. Dun & Co. is a mercantile agency well known in the mercantile community, and have a clientage throughout the United States estimated at 25,000 subscribers, and in the State of Michigan of about 600.

The alleged libel consists in R. G. Dun & Co. sending from their Detroit office to their subscribers what is known as a "Notification Sheet," under date of February 23, 1887, which, under the head of "Items of Record," "Michigan," among other items contained the following:

"Alma—Pollasky Bros. Chat. Mort., $10,000. D. G., clothing, and B. & S."

This item was wholly false. R. G. Dun & Co. were non-residents, as also was Robert G. Dun, and no service of process was had upon him in this suit, and he did not appear to the action.

Minchener was general manager of a district of the Michigan business, and was located at Detroit. He was paid a salary, and a further compensation for his services, depending upon the amount of business done in Michigan. He had authority to employ clerks and to discharge them. Notification sheets were sent direct to subscribers

from the Detroit office. Reports were made to, and all letters containing information affecting the credit of tradesmen were mailed to, his address individually in Detroit. He had a chief clerk, who opened these letters and noted their contents. Minchener based his defense upon two grounds:

1. That the communication was privileged.
2. That the libel, if libel it was, was published by R. G. Dun & Co.; that he was not a member of that company, and had no proprietary interest therein, and was not responsible for its publication.

The trial court took the case from the jury, and directed a verdict for defendant upon the ground that Minchener was not liable.

1. Was the notification sheet, which was sent to all subscribers, a privileged communication?

In *Bacon v. Railroad Co.*, 66 Mich. 166, I discussed the subject of privilege in actions for libel, and shall not go over the ground again. I adhere to what I there said, both as to absolute and qualified privilege. There is no foundation for the claim that the libel set forth in the declaration is absolutely privileged. The question is, do the facts of this case bring the publication within the class of communications which are qualifiedly privileged? Qualified privilege extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty; and embraces cases where the duty is not a legal one, but is of a moral or social character, of imperfect obligation. *Bacon v. Railroad Co.*, 66 Mich. 170, and cases cited.

The mercantile agency does not stand in such relation, either of interest or duty, with its subscribers generally,

that communications from it to them generally are privileged. Exceptions exist in relation to those persons who are interested in obtaining the particular information, and to whom it is furnished upon special request. To this extent, and no further, are such communications protected by a qualified privilege.

Consider for a moment the relation of the mercantile agency to its subscribers. It undertakes to furnish them, for a consideration paid in advance, such information relative to the responsibility and credit of merchants and others as it obtains from its subagents, servants, and correspondents, without guaranteeing the accuracy, reliability, or correctness of such information, or being responsible for any loss caused by the neglect of its agents and servants, or for their want of verity. It expressly stipulates that it will not reveal to such subscribers the sources of its information, nor the names of the persons from whom it received it, and requires a pledge from the subscribers that they will never, under any circumstances, communicate to the persons reported the information received concerning them from the mercantile agency. It also adopts measures to prevent the particular communities from ascertaining the name or identity of the person reporting the standing of business men in that community.

These secret and inquisitorial agencies ramify every part of the United States and the Dominion of Canada, and possess the power of destroying with falsehood or calumny the credit of any business man in the country, and of bringing him to bankruptcy and ruin. To hold such vast secret inquisitions exempt from liability for false publications respecting the character and standing of a business man would be to sanction the highest injustice. The business man's integrity, his reputation for fair and honest dealing, his prosperity in the transaction

of his business, are of the utmost importance to him, and are oftentimes his best capital with which to carry on his business.

Commercial credit is based upon confidence, and all known upon how frail foundation commercial confidence is builded. A breath of suspicion may destroy it. Confidence is withdrawn, and the party is ruined. And so, in a broader field, a breath of suspicion is directed against the public credit, suspicion gives place to rumors of disaster, rumors disseminated undermine the general confidence, and a panic is the result. On the other hand, these same commercial agencies, which always have their fingers upon the business pulse of the country, are a most potent factor in keeping up public confidence. They issue their manifestoes of encouragement, and scatter them broadcast over the land. They are read by the business men of the country. The newspapers assist the circulation among all classes of people, and public confidence is strengthened, or, at least, fears of disaster are allayed. In this they exert a strong influence for good, and are recognized institutions in carrying on the business of the country. But they are also potent for evil to the individual. They send out their notification sheets containing a false statement respecting a particular person, and he is undone,—no one will trust him, and all claims are pressed for immediate payment. His business character is sullied, confidence is withdrawn, and his business career has received a blow which it will require a long time to repair.

The notification sheet containing the false statement respecting the acts of Pollasky Bros. was not alone sent to those who were dealing with them and extending them credit, but to between six and seven hundred subscribers in Michigan, and others residing out of the State, from some of whom they might wish to purchase goods upon

credit, and this without any request being made to be informed of the standing or credit of Pollasky Bros.; and others of whom, and by far the greater number, were engaged in different lines of business, and were in no manner interested in knowing their standing, or financial ability or business integrity. To all such the communication was not privileged. It cannot be said that a blacksmith, a saw-mill and lumber dealer, a furniture manufacturer, a dealer in hardware, a chemist, mineral water bottlers, butchers, book agents, physicians, or druggists, or those in other business mentioned in the notification sheets who are not engaged in the wholesale or retail dealing in dry goods, clothing, or boots and shoes, are at all interested in the business standing of a dealer in dry goods, clothing, and boots and shoes.

No court has gone so far as to hold that all communications made by a mercantile agency to its subscribers, if made in good faith, but made generally, without request, or to those not inquiring concerning or interested in knowing the condition and financial standing of a person, are privileged. On the contrary, courts have uniformly held that privilege does not extend to false publications made to patrons who have no such interest in the subject-matter. *Goldstein v. Foss*, 2 Car. & P. 252 (12 E. C. L. 556); *Com. v. Stacey*, 8 Phila. 617; *Taylor v. Church*, 8 N. Y. 452; *Ormsby v. Douglass*, 37 Id. 477; *Sunderlin v. Bradstreet*, 46 Id. 188; *King v. Patterson*, 49 N. J. Law, 417; *Bradstreet Co. v. Gill*, 72 Tex. 115; *Johnson v. Bradstreet Co.*, 77 Ga. 172; *Erber v. Dun & Co.*, 12 Fed. Rep. 526; and see 26 Amer. Law Reg. (N. S.) 681, and 28 Id. 259.

It was strongly urged upon us at the hearing that we should adopt the able opinion of Van Syckel, J., in which he dissents from the majority of the court in *King v. Patterson*, in which he goes the whole extent of

giving immunity to commercial agencies for all publications made in good faith to their subscribers, whether true or false. In his desire to keep abreast of the progressive state of society, and the new and varying conditions that may arise in the progress of the age, he has entirely overlooked the rights of the individual; forgetting that—

"Society is organized and courts established for the protection of the rights of individuals."

It is all very well to advance the interests of the wholesale dealers as a class, and afford them information which will reasonably protect them from loss. But there is no principle of justice or of law which requires this to be done at the expense of the individual. It would be a harsh and tyrannical rule that would protect one person from loss at the pecuniary ruin of another. The welfare of society does not require that a few great wholesale dealers shall thrive by the sacrifice of many or of any small purchasers.

The Code of Georgia defines "privilege" very much the same as it signifies at common law. Section 2980 declares as privileged communications:

"1. Statements made *bona fide,* in the performance of a public duty.
"2. Similar statements in the performance of a private duty, either legal or moral."

In *Johnson v. Bradstreet Co., supra,* the commercial agency sought to justify a false charge made against the plaintiff under the plea of privilege. After showing that the false charge was not made in the performance of a public duty, Jackson, C. J., said (p. 175):

"If one makes it his business to pry into the affairs of another in order to coin money for his investigations and information, he must see to it that he communicate nothing that is false."

And he held that the communication made under a contract similar to the one introduced in evidence in this case was not the result of a private duty, either moral or legal, in the sense of the statute, and was not privileged.

If we should advert to the circumstances of the publication of this libel, we could point out circumstances from which a jury might infer express malice. The information was obtained from Mr. Balke, an attorney at Alma, where Pollasky Bros. carried on business. He was the correspondent of the agency at that place. On February 20, 1887, he sent a letter by mail from Alma, addressed to George H. Minchener, Detroit, in which he stated:

"I write to inform you that there has been a chattel mortgage of $10,000 filed in this township upon the stock of dry goods and clothing, boots and shoes, of Pollasky Brothers, running to Citizens' National Bank, Detroit. Think it is the forerunner of a failure. Would advise caution in dealing with them."

This was received at the Detroit office of Dun & Co. on the 21st, and the letter was opened by the chief clerk, Thomas, who knew that there was no Citizens' National Bank in Detroit. He knew that the information was not correct in that particular. Notwithstanding, he took this letter, and directed a type-writer to make a report to send out in proper form, as follows:

"Pollasky Brothers, dry goods, clothing, boots and shoes, Alma, Gratiot county, Michigan.—A chattel mortgage of $10,000 has been filed in this township, covering their stock of dry goods and boots and shoes, running to Citizens' National Bank, Detroit. It is thought that this may be the forerunner of a failure. Would advise caution in dealing with them, *and prompt action on the part of creditors.*"

The words in italics were added in the Detroit office, and were very pernicious in their effect upon Pollasky

Bros., for they not only found their credit ruined, but their creditors took prompt action in presenting claims that were not due as well as those that were. R. G. Dun & Co., at Detroit, advised Balke that there must be some mistake, as there was no such bank in Detroit, and requested him to investigate further, and report, and, instead of waiting for the result of such investigation, sent out the notification sheet uncorrected, and containing the wholly false statement, on February 23.[1] It would seem that plenty of time had elapsed, where daily mails and telegraphic wires connect the two points, to ascertain the truth of the report.

2. Is George H. Minchener liable for the publication of this libel? The attorney for the plaintiffs insists that the facts in the case directly connect the defendant, Minchener, with the publication, and establish an implied consent to and authorization of the publication, of the libel complained of. He claims that—

"The evidence was uncontradicted that the information contained in the item in the notification sheet concerning plaintiffs was sent to the office of the defendant, Minchener, in Detroit, in a letter by one Balke, an attorney at Alma, Mich. It is addressed to 'George H. Minchener, Detroit, Mich.,' not to 'R. G. Dun & Co.,' or to 'Geo. H. Minchener, agent R. G. Dun & Co.,' but to 'Geo. H. Minchener' personally and individually. There is not a line or word in the letter to indicate that it was intended for R. G. Dun & Co. The defendant swears he did not receive it, but found it in the office of R. G. Dun & Co., of which he was manager, and, when he found it, that it was opened. And, in explanation of this, he says that stamped envelopes are furnished to the attorneys of the agency, in which to reply to inquiries, and that those envelopes, for the Detroit office, and sent out therefrom, were addressed 'George H. Minchener;' and he leaves it to be inferred that this letter came in one of these envelopes, and was opened by his chief clerk, Charles F.

[1] This was done by Chief Clerk Thomas, in behalf of the agency.
81 MICH.—19.

Thomas, who prepared the notification sheet from it, and also sent out the notices to the other offices of R. G. Dun & Co.   Minchener testifies that all letters in envelopes, with the printed address, 'Geo. H. Minchener, Detroit, Mich.,' would go into his chief clerk's hands, whose duty it would be to open it, and, unless there was something exceptional in connection with the matter, Minchener's attention would not be called to it."

And he contends that,—

"If we believe Minchener's testimony, the case, therefore, stands thus: Minchener authorizes Thomas to open all letters addressed to him, and to incorporate in the notification sheets whatever items of news he finds in such letters without consulting him, 'unless there was something exceptional in connection with the matter.' Thomas, acting under this authority, receives the Balke letter, prepares the notification sheet from the information therein, and sends out this false and wicked libel broadcast all over the United States.   When sued for the serious damage which the libel has caused the plaintiffs, he replies: 'I knew nothing whatever about it.  You must sue Thomas, my chief clerk, or R. G. Dun & Co., my principal, but you can't sue me because of anything my chief clerk did.'"

The plaintiffs' counsel also contends that the principles of *respondeat superior* do not apply in cases for libel; that the proposition is general and elementary that—

"Every one who requests, procures, or commands another to publish a libel is answerable as though he published it himself. And such request need not be express, but may be inferred from the defendant's conduct;" citing Odgers, Lib. & Sland. 155.

The same work, at page 359, lays it down as the law that—

"If any agent or servant be in any way concerned in writing, printing, publishing, or selling a libel, he will be both civilly and criminally liable.  If a clerk or servant copy a libel, and deliver the copy he has made to a third person, he will be liable as a publisher. That his master or employer ordered him to do so will be no defense."

It is not necessary to go to the full extent of the text to hold an agent liable severally or jointly with the principal.

"In general," says Mr. Justice Cooley, "all persons in any manner instrumental in making or procuring to be made the defamatory publication are jointly and severally responsible therefor. Therefore, one, in the course of whose business a libel is published by his agent, may be joined with an agent in an action for the publication." Cooley, Torts, 194.

There was testimony in the case sufficient to be submitted to the jury upon the question whether Minchener published, or caused to be published, the publication alleged to be libelous, and the court erred in taking the case from them.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.