### GRINNELL v. CABLE-NELSON PIANO CO.

1. LIBEL AND SLANDER—PUBLICATION—JOINT DEFENDANTS.
    All persons who have been engaged in, or have been connected with, the publication of a libel, are responsible for the results.

2. SAME.
    Though no direct testimony established the agency of defendants in circulating a libelous letter, evidence that one of the defendants procured the jurat of the writer of the letter, that he forwarded it to the other defendant by whom he was employed, that it was for such employer's interest in competition with plaintiff to publish the statements, and that the writer was afterwards taken into its employ after having certain conferences with its officers, in one of which it appeared that the use of such letter was discussed, that the writing of the same was done at the instance of the other defendant and one of its employés took it and made use of the letter, furnished evidence sufficient to require the submission of the question to the jury.

Error to Washtenaw; Kinne, J. Submitted January 23, 1912. (Docket No. 93.) Decided March 12, 1912.

Case by Ira Grinnell and Clayton A. Grinnell, copartners as Grinnell Bros., against the Cable-Nelson Piano Company and William H. Proctor for libel. A judgment for defendants on a verdict directed by the court is reviewed by plaintiffs on writ of error. Reversed.

*William L. January* (*A. J. Sawyer, Jr.*, and *Geer, Williams, Martin & Butler*, of counsel), for appellants.

*John P. Kirk* and *Arthur Brown* (*M. J. Cavanaugh*, of counsel), for appellees.

STONE, J. This is an action on the case for publishing an alleged libel.

The plaintiffs are, and were in 1909, engaged in the business of dealing in musical instruments generally, and in the manufacture and sale of pianos, and are known to the trade as "Grinnell Bros.," and have their principal store at Detroit, and between 30 and 40 branch stores at different places in Michigan. The defendant the Cable-Nelson Piano Company is, and in 1909 was, a corporation engaged in the manufacture and sale of pianos, with its factory at South Haven, Mich., and its principal business office in Chicago. In 1909, and at the time of the trial, Fay S. Cable was its president. In 1909, the defendant Proctor was the agent or traveling salesman of the defendant corporation for the territory comprising Indiana, Ohio, and the lower peninsula of Michigan, residing at Ypsilanti. The defendant corporation had at least 30 or 40 dealers in pianos of its manufacture in this State. Part of Proctor's duties as traveling salesman was to visit dealers, and whenever he learned of anything on these visits which he thought would be of interest to the defendant corporation he would make a report of it. There was keen competition between the plaintiffs and the defendant corporation, and in April, 1909, this competition was "waxing warm," as Mr. Cable expressed it. At Ypsilanti, there was a music dealer by the name of The-

odore C. Smoke, who had at one time been in the employ
of the plaintiffs, but who had, some time prior to April,
1909, engaged in business on his own account, and was
handling at that time the Starr & Baldwin line of pianos,
the Henderson line, and the Cable-Nelson pianos, manu-
factured by the defendant corporation.

Mr. Smoke, under date of April 24, 1909, wrote and
addressed to Mr. Proctor the following letter:

"YPSILANTI, 4/24/1909.

"Mr. H. D. PROCTOR,
             "City.

"*Dear Sir:*

"You was speaking to me about the Stile E. Cable
Nelson. I guess I had better not order that Stile that is
the Stile that the Grinnell Bros. got when they bought
out Wolcott at Hillsdale and they took it in the back
room and sand-papered the hammers off so as to make it
sound tinny. Also let now and then a string down, and
took it down to the depot and shipped it to Kalamazoo.
Now they are just mean enough to ship one right out
here to Ypsilanti. I am not at all afraid of them but I
know all their dirty tricks. They fixed a Capin that way
in Kazoo once. We sold Mrs. Herb Gilson at Scotts,
Mich., a sterling Stile 79 for $65 and this Capin piano.
It was at the time Schwankovsky had such a great run
on the Capin. And I know they have done the same to
the Cable Nelson for I was instructed to help to do it. I
am pressing them hard and they'll not be square so I
wouldn't be surprised at anything.

"Yours respectfully,
             "THEO. SMOKE."

Proctor was at this time acquainted with Smoke, and
had made a "consignment" contract with him to handle
the Cable-Nelson pianos before this letter was written.

Relative to this letter, defendant Proctor testified as
follows:

"I called there to solicit an order for some pianos, and
Mr. Smoke told me this story from A to Z unsolicited,
without any solicitation on my part whatever. I did not
ask him for it. He told me this story. I was asking
him to buy style E, and he gave this as a reason for not

wanting to buy it. I said: 'Mr. Smoke, I am very busy this morning. You don't mean to tell me they did anything like that?' He said, 'That is the truth.' I said: 'I am very sorry to hear anything like that, even against our competitors, I am busy this morning. If you know anything like that I think you ought to write us about it.' I supposed he would write to the company; but in a few days I received this letter at Ypsilanti. I was away a good deal; but I was living at Ypsilanti. It was several days after he told me this before he wrote me, and I had almost forgotten about it, and this letter came in and called my attention to it. There was no other letter besides that to me in which that was contained. He just mailed that to me. It is addressed to H. T. Proctor. He was not familiar with my initials at that time, and he was very little acquainted with me. He made a mistake in my given name. He afterwards told me that he made a mistake. When I received that, I either turned it in to the Cable-Nelson Piano Company at Chicago personally, or sent it to them, as I felt that I had a right to do; that is what I did."

Mr. Cable, the company's president, testified that this letter was received, and that after he had read it he turned it over to his correspondence clerk, Mr. Turnes, who had charge of the correspondence of the office. Cable and Turnes talked over the advisability of having the letter sworn to by Smoke, in order that the defendant corporation could use it in its fight against the plaintiffs. Upon that subject, Mr. Cable testified as follows:

"*Q*. What was the object, if you had any, of having the first letter sworn to by Mr. Smoke?

"*A*. That was something I presume Mr. Turnes thought advisable to have.

"*Q*. Did you and Mr. Turnes talk it over, about having it sworn to?

"*A*. I think he asked me if it was a good plan to have that sworn to. I think I said, 'I think it would be,' or something of that kind, I don't just recollect what he said to me or what I said to him in relation to it.

"*Q*. But you do think that you told him that you thought you would better have the letter sworn to, is that right?

"*A.* I think there was something said in relation to securing an affidavit in regard to the letter.  *  *  *

"*Q.* If you did not care so much about it, what was the object in retaining the original, and have Mr. Smoke sign it before he returned it to you, and swear to it?

"*A.* I think, if Mr. Turnes called my attention to it, I said to him it would be well to have that, in order to protect our interests.

"*Q.* What interests do you mean?

"*A.* Where we are selling goods.

"*Q.* In competition with Grinnell Bros.?

"*A.* Yes, sir.

"*Q.* So you wanted this affidavit really for your salesmen in the different localities where you and Grinnell Bros. were in competition?

"*A.* In case we needed it.

"*Q.* And you wanted it for that purpose? That was the object, was it not, in having it sworn to, so as to have it a little stronger?  .

"*A.* To be sure it was correct."

Accordingly a letter was prepared, under date of April 28, 1909, which was signed in the corporate name by Mr. Cable, and was addressed and sent to Smoke at Ypsilanti. The original letter to Proctor was returned to him, and he kept it in his files at the First National Bank at Ypsilanti until after the commencement of this suit, when it was produced by Proctor and turned over to defendants' attorney. The letter of April 28th, omitting the part which is not material here, was as follows:

"F. S. CABLE, Pres't and Treas.
                              "GEO. W. SCHULTZ, Sec'y.
                "M. A. MYERS, Vice Pres't.
          "CABLE-NELSON PIANO COMPANY,
          "Manufacturers of Fine Pianos.
"Fourth Floor, 209 State St., Corner Adams Republic
      Bldg.   Factory, South Haven, Michigan.
                              "CHICAGO, April 28, 1909.
"Mr. THEODORE SMOKE,
              "Ypsilanti, Mich.
  "*Dear Sir:*  *  *  *  By the way, Mr. Proctor recently sent us your letter of the 24th which you wrote him at Ypsilanti and we have read the same with much inter-

est.   This is in regard to a style ' E ' that Grinnell Bros.,
of Detroit, Mich., bought from C. S. Wolcott, of Hills-
dale, Mich., which you assisted in making imperfect at
their request.   We would like an affidavit from you to
the effect that you did this, so that we can use it in our
fight against Grinnell Bros., which is *waxing warm* in
different places throughout Michigan.   We are sending
you a copy of the letter which you wrote Mr. Proctor so
that you may know what it contains and if you will re-
write this, embodying these facts in the affidavit that you
make, it will do us a great deal of good as well as your-
self.   If you will favor us as requested, we will be very
glad to have you do so.   *   *   *

" Very truly yours,
" CABLE-NELSON PIANO CO.
[Signed]        " F. S. CABLE."

It will be noted that it is stated in this letter that "a
copy of the letter" which Smoke wrote to Proctor was
being sent to Smoke, and he is requested to rewrite the
letter and embody the same in an affidavit.   Proctor tes-
tified that he was at Smoke's house on May 2d, and that
Smoke showed him the letter which he had received from
the defendant corporation, and also showed him a copy
of the letter of April 24th (save that it had been consider-
ably changed in phraseology, grammatical construction
and spelling), rewritten on Smoke's business stationery,
evidently copied by him from "copy" sent him in the
letter of April 28th.   It appears that on May 3d Smoke
and Proctor met at the First National Bank in Ypsilanti.
A jurat was put on the letter in the bank, and Frederic
L. Gallup, a notary public for Washtenaw county, swore
Smoke to the letter, and subscribed his certificate to that
effect at the bottom of the letter.   Smoke then gave the
letter with the jurat attached to Proctor, who turned it
over to the defendant corporation, either sending it by
mail or handing it over personally.   Mr. Cable admitted
the receipt of the letter which had been sworn to before
Gallup.   This letter was rewritten and sworn to as fol-
lows:

" Player Pianos.                    " Cable-Nelson.
" Music Cabinets.                   " Lakeside.
" Grand Pianos.                     " Henderson.
        " From Factory to Your Home.
              " THEODORE SMOKE,
        " *Ypsilanti's Leading Music Dealer.*
        " Piano Rooms, 11 S. Hamilton St.
" Bell phone 5731.          Home phone 252 Black.
              " YPSILANTI, MICH., 4 / 24 / 1909.
    " Mr. WM. PROCTOR, City. — *Dear Sir:* You were
speaking to me about ordering a style E Cable-Nelson and
I guess I had better not order it as it is the same style that
the Grinnell Bros. got when they bought out Mr. C. S.
Wolcott at Hillsdale, Mich., about a year ago. They
took that piano in their back room and sand-papered the
hammers off so as to make it sound tinny; also let down
a string now and then, and then boxed it up and shipped
it to their store at Kalamazoo, where your company has
a branch store.
    " Now, they are just mean enough to ship one of that
same style here if they can get it.  I am not a bit afraid
to put a Cable-Nelson in beside them if they are only fare
but, after being with them 7 years, I almost know all
their dirty tricks as they fixed a ' Capon ' that way once.
We had sold a Mr. Gilson at Scotts, Mich., a Sterling
style 79 walnut, new, for this old Capin and $65 in money.
The Capin at that time was handled by F. J. Schwan-
kovsky, of Detroit, Mich.  He also had a store at Kala-
mazoo.  They got this Capin piano for no other purpose
only to make it imperfect to use against Mr. Schwankov-
sky, I know they did the same with the style ' E ' Cable-
Nelson, for I was instructed to help do it.  I am pressing
them hard here and they know they cannot compete with
me fare, so I would not be surprised at anything they do.
    " Very truly yours,        THEODORE C. SMOKE.
        [Seal]       " FREDERIC L. GALLUP,
        " Notary Public, Washtenaw County, Mich.
    " Subscribed and sworn to before me this 3d day of
May, A. D. 1909.
        " FREDERIC L. GALLUP, Notary Public.
    " Commission expires Jan. 3, 1912."

    Mr. Cable testified that, when this letter came back
sworn to, " Mr. Turnes took it and used it;" that he did not
know what Mr. Turnes did with it after he took it and

filed it away. After this suit was begun, the letter was produced by the defendant corporation and turned over to its attorney.

On June 9th and 10th, there were mailed in Chicago, in plain white envelopes, with no return address, to divers dealers in musical instruments, typewritten, substantial copies of said letter of April 24th, with the jurat attached. Such letters were received by divers persons who were dealers; one being addressed to Grinnell Bros., Flint, Mich. After these letters had been put in circulation, the plaintiffs commenced to investigate their source. On or about February 24, 1910, plaintiffs' attorney had some talk with Mr. Smoke and Mr. Proctor at Ypsilanti. The latter testified that he "had a pretty hot talk with Mr. January at that time in relation to the publication of those letters. I thought some things Mr. January asked me were none of his business, and I told him so." Proctor further testified that, either that evening or the next day, he called up Mr. Cable at Chicago by long distance telephone, and told him about the talk he had had with Mr. January, and that as a result of that talk Mr. Cable came to Ypsilanti about three days thereafter; that Messrs. Cable, Proctor, and Smoke had dinner together at the hotel, and it was arranged that Mr. Smoke should enter the employ of the defendant corporation, which arrangement was carried out, and Smoke has since been in the employ of said defendant.

We have stated in a general way the substance of the case as made by the plaintiffs at the trial. Upon the close of the plaintiffs' case, the defendants moved for a directed verdict, upon the ground that no evidence had been introduced showing that the defendants, or either of them, had anything to do with publishing or circulating the alleged libelous letters. The circuit judge granted this motion, assigning the following reasons for his action:

"I shall say and direct the jury that, in my opinion, under the evidence submitted, there is no proof nor competent evidence that the defendants here are guilty of

either publishing or circulating this libel. There is no proof of publication or of any circulation whatever on their part. Therefore the defendants are entitled to a direction from me of a verdict of no cause of action."

Verdict and judgment for the defendants followed, and the plaintiffs have brought the case here for review on writ of error.

It is the claim of the plaintiffs that the trial court erred in thus directing a verdict, and that sufficient evidence was introduced to warrant the jury in finding that both defendants were responsible for the publication of the libelous letter in question to the several persons to whom the evidence showed that the "copies" were mailed. We have no doubt that the evidence showed a publication. The important question is, Are the defendants, or is either of them, liable for the publication thus shown?

The rule is well settled that all persons who have been engaged in, or have been in any way connected with, the publication of a libel are responsible therefor. *Pollasky* v. *Minchener*, 81 Mich. 280–291 (46 N. W. 5, 9 L. R. A. 102, 21 Am. St. Rep. 516); Cooley on Torts, p. 194.

Did the plaintiffs make such a *prima facie* case as entitled them to have the same submitted to the jury? Taking into consideration the relations of the parties, the fact that they were competitors in business, and that such competition was keen, that the goods of both parties were handled in this State in competition, that the alleged libelous letter was written at the suggestion of the defendants, that defendant Proctor met Smoke and conferred with him about making the affidavit, and went with him to the notary, and received the letter with the jurat attached, and forwarded it to the defendant corporation, that, in so far as appears, the defendant corporation alone had the letter in its possession, that the president of the defendant corporation, when litigation was likely to follow, took Smoke into its employment, that defendants alone would be likely to be benefited by the publication, all of these facts taken together lead us to the conclusion that the trial court

should have submitted the case to the jury, under proper instructions. *Haney Manfg. Co.* v. *Perkins*, 78 Mich. 1 (43 N. W. 1073). In that case the court said:

> "Certain facts being proven, the natural inferences to be drawn from these facts were for the jury, and the court was in error in holding that there was nothing to go to the jury."

We think that this language is applicable to the instant case.

In the case of *Bent & Cottrell* v. *Mink*, 46 Iowa, 576, where a similar question was presented, the court said:

> "There is great similarity between this question and that of a threat made, and the thing threatened is afterwards done. For instance, suppose one threatens to take another's life, and within three days the latter is found dead, and the former is being tried for the crime. Now, some one has committed this offense, the body of which is that the party has been murdered, and the point to be solved is, Who did it? Certainly the threats made would be admissible for this purpose. In the present case, the body of the offense is the publication. The fact that they have threatened to write such a paper is sufficient evidence, *prima facie*, when unexplained, that they, or rather the writer, did so. We desire to be understood it made a sufficient *prima facie* case to have made it the duty of the court to have submitted the question to the jury. The publication may be proved by direct or indirect evidence. 1 Hilliard on Torts, 336. As to the latter, no general rule can be laid down. It is, and of necessity must be, as varied as are the circumstances and conditions of human affairs, and each case must form a rule unto itself."

25 Cyc. pp. 503, 504, and cases cited; *People* v. *Ritchie*, 12 Utah, 180 (42 Pac. 209).

We are of opinion that the trial court erred in directing a verdict for the defendants, and the judgment below is reversed, and a new trial granted.

Moore, C. J., and Steere, McAlvay, Brooke, Blair, and Ostrander, JJ., concurred. Bird, J., did not sit.