STATE v. GEORGE T. COLBY.

May Term, 1924.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed October 7, 1924.

*Indictment and Information—Sufficiency of Information Cannot Be Tested by Objections to Evidence or Motion for Verdict—Criminal Libel—Acts Constituting Publication—Harmless Error—Right of Free Speech Does Not Permit Publication of Unfounded Charge against Candidate for Office.*

1. Sufficiency of an information, either as to form or substance, cannot be tested by objections to the evidence or by motion for a verdict.

2. In a prosecution for criminal libel, each of the acts of the respondent, in delivering to a printer a manuscript falsely charging the State's attorney with bribery, and in leaving printed copies thereof at a place agreed upon, was a participation in the publication of the libel, making him civilly and criminally liable therefor.

3. Error, if any, in instructing jury that leaving libelous circulars by respondent at a place agreed upon constituted publication of the libel, was harmless, where respondent admitted having given out some of the circulars to voters who asked for them, as no question was or could be made as to the sufficiency of this as a publication.

4. While one presenting himself as a candidate for public office submits for consideration and discussion of the voters not alone his capacity to administer the office sought, but his moral fitness therefor as well, the rule has no application to unfounded charges of crime, and one may not assail the character of a candidate for office by falsely charging him with criminal misconduct, and escape punishment on the ground that the charge was made in good faith, for a beneficent purpose, without malice, and under an honest and reasonable belief that the charge was true.

INFORMATION for criminal libel. Plea, not guilty. Trial by jury at the December Term, 1921, Orange County, *Moulton,* J., presiding. Verdict of guilty, and judgment and sentence thereon. The respondent excepted. The opinion states the case. *Affirmed.*

*Earle R. Davis* and *John W. Gordon* for the respondent.

*Frank C. Archibald,* Attorney General, and *M. C. Taft,* State's attorney, for the State.

POWERS, J. The respondent was convicted of criminal libel under an information charging him with having published a circular addressed to the voters of Orange County, advocating the election of E. W. Kent as assistant judge of the county court, and Doctor Angell as senator; in which circular, speaking of another candidate for assistant judge, the following language was used: "If you want to know more, come to Williamstown and ask any one who was present at the Gale auction, and if our State's attorney had done his duty and had not been hired to do otherwise, the candidate for side judge would have been behind the bars long ago." It was upon this charge of bribery made against the State's attorney that a conviction was sought and obtained.

It was shortly before the primary election in 1920 that this circular appeared in various towns in Orange County. John C. Sherburne was then State's attorney of that county, and was a candidate for the nomination for county senator.

[1] Various objections to the sufficiency of the information, both in form and substance, are urged upon our attention, but they are not properly before us. The respondent did not move to quash, demur, or move in arrest. He pleaded not guilty, and challenged the information only by objections to evidence and by a motion for a verdict. But having joined issue on the facts alleged against him, any pertinent evidence was admissible, *State* v. *Louanis,* 79 Vt. 463, 65 Atl. 532, 9 Ann. Cas. 194; and the sufficiency of an information cannot be tested by a motion for a verdict. *State* v. *Rosenberg,* 88 Vt. 223, 92 Atl. 145; *State* v. *Perkins,* 88 Vt. 121, 92 Atl. 1; *Berkley* v. *Burlington Cadillac Company,* 97 Vt. 260, 122 Atl. 665.

[2] It appeared from the testimony of the respondent,

himself, that the circular in question was prepared for the purpose of being distributed among the voters of Orange County; that he received the original manuscript of it from an unknown source, and took it to a printer to have it printed; that he afterwards received the printed copies from the printer, and in response to a telephone message received from an unknown party, he left them in a certain place to be called for by a person unknown; that still later, he received an undisclosed number by mail, and distributed them, but only to persons who were voters in Orange County, and only to persons who asked for them. The court charged the jury that the act of the respondent in leaving the circulars in the place as stated, was a publication within the meaning of the law. To this instruction the respondent excepted. The instruction was too plainly correct to require extended discussion. All that the respondent did in connection with the circulars was in aid and furtherance of a definite plan which had for its object the placing of the libelous statement in the hands of the voters, as the respondent well knew. This plan was carried out, and its object attained. In these circumstances, each act of the respondent—the delivery of the manuscript to the printer, and the leaving of the printed copies in the place agreed upon—was a participation in the publication of the libel, and made him civilly and criminally liable therefor. *Klos* v. *Zahoric*, 113 Iowa, 161, 84 N. W. 1046, 53 L. R. A. 235; *Miller* v. *Butler*, 6 Cush. (Mass.) 71, 52 A. D. 768; *Finnish Temperance Society Sovittaja* v. *Riavaaja Pub. Co.*, 219 Mass. 28, 106 N. E. 561, Ann. Cas. 1916D, 1087; *Grinnell* v. *Cable-Nelson Piano Co.*, 169 Mich. 183, 135 N. W. 92.

[3] Moreover, if there had been error in this instruction it would have been harmless; for, as we have seen, the respondent admitted that he gave out some of the circulars to voters who asked for them. No question is, or could be made as to the sufficiency of this as a publication.

This brings us to the important question in the case. The court charged the jury to the effect that there was no question of privilege involved, and that it was no defense that the false charge was published in good faith for the information of voters and in an honest belief of its truth. By exception to this instruction and otherwise the respondent challenges the soundness of the proposition therein contained. In his brief, he presents an interesting and instructive discussion of the origin

and scope of the modern doctrine of free speech as guaranteed by American constitutional provisions, both state and federal. He argues that the record discloses a case of qualified privilege, excluding the implication of malice that usually arises in libels, and requiring the State to establish it as an essential fact; and that an honest and reasonable belief in the truth of the statement published is a full protection from this prosecution. Many cases from courts of high standing support this contention. But the great weight of authority and the "true spirit of reason, justice and sound policy" are against it.

It is upon the broad ground of public advantage that the law recognizes as privileged certain communications and publications. Hence it is, as said by *Taft*, J., in *Post Publishing Co.* v. *Hallam*, 59 Fed. 530, 8 C. C. A. 201, "the existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease when the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed."

[4] So the question before us is to be determined by the effect of the result upon the welfare of society at large. All the learned agree that when a man presents himself as a candidate for public office, he submits for the consideration and discussion of the voters, not only his ability, but his character, so far as it affects his qualifications therefor. He puts in issue, so to speak, before the electorate, not alone his capacity to administer the office sought, but his moral fitness therefor, as well. But this rule is not without its limitations. The right to assail a candidate for office is not unlimited. As was said by this Court in *Shurtleff* v. *Stevens*, 51 Vt. at p. 519, 31 A. R. 698: "It is *not* the law, that, because a man fills a station before the public eye, he becomes a target at which all the artillery of ridicule, ill-will, or malice, may be leveled. He may be assailed when duty or interest demands it, and then only under the rules of fair, temperate, conscientious criticism." It is of the utmost importance that a candidate's qualifications, mental, temperamental, and moral, should be made known to the voters. But the object of it all is to make more certain the election of the best man for the office. But it is quite as important that this right to criticise should not be allowed to become an

excuse for vilification and slander. If a candidate must subject himself to false accusations of misfeasance and crime, and the courts are powerless to afford a remedy, either civil or criminal, unless he can prove that the false charges were born of malice, serious results to the public would ensue; self-respecting citizens would refuse to face the hazard of a candidacy for office, and the public would be thus deprived of the services of some of its most worthy and efficient members. To quote again from the case above cited: "But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that, not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good. We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their character outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof."

As a question of practical affairs, this qualified privilege is extended quite far enough without allowing it to become a justification for false accusations of crime. The public good does not require so costly a sacrifice on the part of its citizens. It is not, and never will be, to the public advantage to have such false charges freely circulated. One does not have to be a very close student of practical politics to be convinced of this. The most cursory reading of the newspapers during a political campaign is enough. We do not hesitate to say that the public good will best be served by holding, as we do, that whatever else this qualified privilege may protect, it has no application to unfounded charges of crime. It is not the law that one may assail the character of a candidate for office by falsely charg-

ing him with criminal misconduct, and escape punishment on the ground that the charge was made in good faith, and for a beneficent purpose, without malice, and under an honest and reasonable belief that the charge was true.

This conclusion is supported by very many cases, of which the following are at hand. *Hamilton* v. *Eno*, 81 N. Y. 116; *Sweeney* v. *Baker*, 13 W. Va. 158, 31 A. R. 757; *Upton* v. *Hume*, 24 Or. 420, 33 Pac. 810, 21 L. R. A. 493, 41 A. S. R. 863; *Starks* v. *Comer*, 190 Ala. 245, 67 So. 440; *Dauphiny* v. *Bahue*, 153 Cal. 757, 96 Pac. 880, 126 A. S. R. 136; *Star Pub. Co.* v. *Donahue* (Del. Sup.), 58 Atl. 513, 65 L. R. A. 980; *Pattangall* v. *Mooers*, 113 Me. 412, 94 Atl. 561, L. R. A. 1918E, 14 Ann. Cas. 1917D, 689; *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97; *Oakes* v. *State*, 98 Miss. 80, 54 So. 79, 33 L. R. A. (N. S.) 207; *Smith* v. *Burrus*, 106 Mo. 94, 16 S. W. 881, 13 L. R. A. 59, 27 A. S. R. 329; *Williams* v. *Saunders*, 113 Va. 156, 73 S. E. 472, Ann. Cas. 1913E, 693; *Quinn* v. *Review Pub. Co.*, 55 Wash. 69, 104 Pac. 181, 133 A. S. R. 1016, 19 Ann. Cas. 1077; *Putnam* v. *Browne*, 162 Wis. 524, 155 N. W. 910, Ann. Cas. 1918C, 1085. For other cases, see the State's brief and L. R. A. 1918E, 21. Most of these cases are civil, but no good reason can be given why the same rule should not obtain in criminal cases. The respondent admits this by relying upon *Posnett* v. *Marble*, 62 Vt. 481, 20 Atl. 813, 11 L. R. A. 162, 22 A. S. R. 126, which, he says, is conclusive in his favor. That, too, was a civil case. The plaintiff was a candidate for the appointment of postmistress. The defendant was a member of of the community immediately interested in the result of her application. The false statement was made in response to an inquiry by a postal inspector. It was held that her statement was *prima facie* privileged. But that case is distinguishable from the one in hand. When we call to mind the basis of this qualified privilege, and realize that the public good is the thing to be sought in determining its existence and application, this distinction becomes sufficiently plain. It is pointed out by *Holmes*, J., in *Burt* v. *Advertiser Newspaper Co., supra:* "The reason for distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both instrinsically meritorious. When private inquiries are made about a private person, a servant for

example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional injustice, confined, as it generally is, to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case.'' For the reasons thus so highly indorsed, we think the rule of *Posnett* v. *Marble* should not be extended to a case like this. The much-cherished right of free speech is no more sacred than the right to enjoy the good name that results from a life well lived. Both lie at the very foundation of our liberties. Both are to be safeguarded in every possible way. But the public interest does not require that the latter be made subservient to the former.

*Judgment that there is no error in the record and that the respondent takes nothing by his exceptions. Let execution be done.*